UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK ALAN PETROVICH,<br><br>    Petitioner,<br><br>    v.<br><br>KELLY SANTORO,<br><br>    Respondent. | Case No. 1:15-cv-01546-JDP (HC)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner Rick Alan Petrovich, a state prisoner without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner raises numerous habeas claims, including prosecutorial misconduct, insufficient evidence, ineffective assistance of counsel, and evidentiary errors. The parties have consented to the jurisdiction of a magistrate judge. We will deny the petition for the reasons discussed below.

**I.    Background**

This is an arson case. Under the government's theory, petitioner threw Molotov cocktails at a car and at his ex-girlfriend's house, setting both ablaze. Petitioner pleaded not guilty and proceeded to trial. A jury convicted petitioner of arson of property and using a destructive device. The trial court sentenced petitioner to an aggregate term of fifteen years in prison.

We set forth below the facts of the underlying offenses, as stated by the California Court of Appeal, Fifth District ("Court of Appeal"). A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> On June 27, 2011, police responded to a 911 call at the residence of Tina Haugen on North Inyo Street in Ridgecrest. Ms. Haugen placed the call after discovering a fire burning in her driveway. She used a hose and cups of water to extinguish the flames while the police were en route.
>
> Following their arrival, law enforcement officers observed and photographed a burned area measuring approximately 9 feet by 13 feet. The fire had caused cosmetic damage to two vehicles parked in Ms. Haugen's driveway and left scorch marks on the ground and on part of a wooden fence. Other evidence found at the scene appeared to police to be the remnants of a Molotov cocktail. Petrovich, who was the victim's ex-boyfriend, was arrested in connection with the incident.
>
> The Kern County District Attorney charged Petrovich by amended information with one count of using a destructive device (former § 12303.3) and two counts of arson of property (§ 451, subd. (d)). Petrovich was also accused of having suffered a prior strike and serious felony conviction for first degree burglary in October 2004. (See §§ 667, subds. (b)-(e), 1170.12, subds. (a)-(d).) A defense motion to bifurcate trial of the prior conviction allegations was granted. The remaining charges were tried before a jury in June 2012.
>
> **Motion in Limine re: Evidence of Prior Misconduct**
>
> The prosecution moved in limine to introduce evidence concerning "prior acts of domestic violence and threats of domestic violence perpetrated by the defendant against Tina Haugen" over a seven-week period leading up to the subject incident. The alleged misconduct consisted of two minor physical altercations and threatening statements made by Petrovich during telephone calls, over voicemail, and in text messages. Defense counsel opposed the motion.
>
> The prior incidents were found to be admissible under Evidence Code section 1101, subdivision (b), particularly because each involved the same perpetrator and victim. The trial court explained, "[The evidence] is clearly relevant because it does go to show motive. It goes to show intent, and, theoretically, can go to show identity in terms of who committed the crime on [June] 27th because it does show – in and of themselves these things show ill will, they show motive from Mr. Petrovich towards Ms. Haugen." After conducting an analysis under Evidence Code section 352, the court allowed the evidence to be introduced at trial.

**Prosecution Case**

Tina Haugen met Petrovich in late March 2011 and became romantically involved with him in early April of that year. The relationship turned dysfunctional in a matter of weeks. Petrovich often accused Ms. Haugen of dating other men and had difficulty controlling his temper.

Ms. Haugen recounted an incident from May 7, 2011 in which Petrovich allegedly grabbed her arm during an argument, leaving a bruise. Three days later, he left an insulting and profanity-laced message on her voicemail which threatened, "You fuck with me again, I'll break your fucking neck." Frightened by the message, Ms. Haugen contacted police and obtained an emergency restraining order. She purportedly lifted the restraining order a week later after being pressured to do so by Petrovich. In that regard, she testified he had threatened to "beat me like the bitch that I am."

Ms. Haugen ended her relationship with Petrovich around mid-May 2011, but maintained contact with him well into the month of June. It was during this post-break-up period that Petrovich began living with a woman named Angela Lewis. For some reason this angered Ms. Haugen, who reacted to the news by gathering up clothes Petrovich had left at her house and dumping them in the street near Ms. Lewis' apartment. According to Ms. Lewis, the clothes were covered in motor oil and strewn across both sides of the road. Ms. Haugen claimed she left the clothes on the sidewalk in plastic bags and denied pouring motor oil on them. In response to specific inquiries by the prosecution, Ms. Haugen also denied soiling the clothes with urine and feces.

The clothing incident occurred on June 7, 2011. Approximately two weeks later, on June 20, 2011, Petrovich got into a heated argument with Ms. Haugen outside her place of employment and shoved her against his truck. Despite his aggressive behavior, Ms. Haugen continued to communicate with Petrovich until the day of the fire and frequently made disparaging remarks about the women with whom she believed he was having sexual relations. She referred to Angela Lewis in text messages as a "mutt" and a "whore," and told Petrovich that he was lowering his standards by sleeping with someone who was "uglier than sin." Ms. Haugen was also critical of Petrovich's stated intention to get back together with an ex-wife named Victoria Vorwerk—a person she colorfully described as being a "whore," "white trash," and a "cunt bag."

Ms. Haugen exchanged a series of text messages with Petrovich in the early morning hours of June 27, 2011. In one of the messages Petrovich cryptically said, "Your [sic] next." Later that day, she saw Petrovich driving near her residence and watched him pick up Angela Lewis from the home of one of her neighbors, Kellee Clodt. Petrovich then turned his truck around, drove past Ms. Haugen's house, and "flipped off" a woman named Theresa Thatcher who was smoking a cigarette in Ms. Haugen's front yard. Petrovich allegedly yelled, "I'll be back" as he left the neighborhood.

3

Theresa Thatcher was a friend of Ms. Haugen's who happened to be visiting her on the evening in question. She was familiar with Petrovich, and thus acknowledged him with her own hand gesture when he drove past the house. Ms. Thatcher was still at the residence approximately one or two hours later when she and Ms. Haugen smelled smoke and realized that their vehicles were on fire.

Investigating officers from the Ridgecrest Police Department later found the tell-tale signs of a Molotov cocktail in Ms. Haugen's driveway: shards of blackened glass, a burnt scrap of clothing which had apparently been used as a wick, and copious amounts of an oily substance that smelled like gasoline. The glass appeared to have come from a vodka bottle, as indicated by a Smirnoff label affixed to some of the broken pieces.

Detective Manuel Castaneda was responsible for documenting and collecting the physical evidence. He testified that the oily substance found in Ms. Haugen's driveway was "literally everywhere," coating the broken glass and large portions of a Dodge Charger which belonged to Theresa Thatcher. The paint on both Ms. Thatcher's car and Ms. Haugen's pickup truck showed discoloration consistent with burn damage from a fire.

While Detective Castaneda was processing the crime scene, other officers located and arrested Petrovich at the home of his ex-wife, Victoria Vorwerk. Police found Petrovich's truck parked in Ms. Vorwerk's back yard with the windows rolled down and a strong odor of gasoline emanating from inside the vehicle. The bed of the truck contained an oily substance similar to what was found at Ms. Haugen's residence.

Forensic analysis of carpet samples taken from the interior of Petrovich's truck and of glass found at the crime scene confirmed the presence of gasoline on each. The tires on the truck matched the size and tread pattern of tracks left near the curb outside of Ms. Haugen's house. Other physical evidence suggesting appellant's involvement in the offense included empty bottles of Smirnoff vodka and torn strips of clothing found in the garage area of Angela Lewis' apartment.

Ms. Lewis testified against Petrovich at trial. She confirmed that he picked her up from the home of Kellee Clodt on the night of the fire and said he was accompanied by a man named Ricky Caine. The alleged presence of Mr. Caine was consistent with the testimony of Tina Haugen and Theresa Thatcher in that both recalled seeing an unidentified man in Petrovich's vehicle.

Petrovich brought Ms. Lewis to her apartment and stayed there for a short period of time before departing with Mr. Caine. The men returned approximately ten minutes later, at which point Ms. Lewis realized Petrovich had taken a gasoline can from her garage and placed it in the bed of his truck. Petrovich rummaged through her recycling bin, removed a few beer bottles, and left again. Ms. Lewis was concerned about Petrovich's behavior because it

appeared he had been drinking and his demeanor seemed "unstable," "violent," and "angry." She further testified that Petrovich had a telephone conversation with someone before leaving her apartment and told the person he was going to "blow up her house."

**Defense Case**

The defense called no witnesses and rested immediately following the conclusion of the prosecution's case-in-chief.

**Verdict and Sentencing**

Petrovich was convicted of using a destructive device and of arson of property belonging to Tina Haugen. The jury deadlocked on the charge of arson of property belonging to Theresa Thatcher, resulting in a mistrial on that count. The unproven arson charge was subsequently dismissed. The prior conviction allegations were found to be true in a bench trial that followed the jury verdict.

The trial court sentenced Petrovich to a total term of 15 years in prison. His sentence was calculated using the middle term of five years for the offense under former section 12303.3, which was doubled to 10 years as a result of the prior strike (§ 1170.12, subd. (c)(1)) and extended by five more years for the prior serious felony conviction (§ 667, subd. (a)(1)). A separate four-year sentence was imposed for the arson conviction and stayed pursuant to section 654. Petrovich received 614 days of presentence custody credit based on 410 days of actual time served and 204 days of local conduct credit.

*People v. Petrovich*, No. F065617, 2014 WL 2095402, at *1-4 (Cal. Ct. App. May 20, 2014).

## II. Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). In a Section 2254 proceeding, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The standard that governs the federal court's habeas review depends on whether the state court decided petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of Section 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). One rule applies to all state prisoners' petitions decided on the merits: the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a Section 2254 petitioner still must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under Section 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that offer no reasoning at all. *See Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then Section 2254(d)'s deferential standard does not apply. *See Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016). However, if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under Section 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has explained, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). The federal court's habeas review serves as a "guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

Here, petitioner raises eight claims for habeas relief:

> (1) the prosecutor inappropriately changed the government's theory of petitioner's guilt at trial;
>
> (2) the jury had insufficient evidence to find petitioner's guilt;
>
> (3) the trial court erred on several of its evidentiary rulings;
>
> (4) petitioner received ineffective assistance from his trial counsel;
>
> (5) petitioner received ineffective assistance from his appellate counsel;
>
> (6) the trial court erred in admitting certain evidence of petitioner's uncharged misconduct;
>
> (7) the prosecutor committed misconduct during closing argument; and
>
> (8) the state courts' denial of presentencing credit violates petitioner's rights under the Equal Protection Clause.

California state courts addressed all these claims on the merits either on direct appeal or in petitioner's state-court habeas proceeding. We will address petitioner's claims out of order for efficiency's sake.

**a. Insufficient Evidence (Claim 2)**

Petitioner contends that the jury had insufficient evidence to find him guilty, noting that no witness testified to seeing him throw the Molotov cocktails. The Court of Appeal rejected this claim on direct appeal, concluding that the jury had enough evidence to find petitioner guilty. We see no error.

A criminal conviction unsupported by evidence can violate the Fourteenth Amendment's promise of due process, *see Jackson v. Virginia*, 443 U.S. 307, 317-18 (1979), but a habeas petitioner challenging the sufficiency of evidence must overcome "two layers of judicial deference," *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). Under *Jackson v. Virginia*, the appellate court on direct appeal decides "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). On habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1225 (9th Cir. 2018) (quoting *Coleman*, 566 U.S. at 651). Combining the *Jackson* and Section 2254 deference, petitioner must show that "*no* fairminded jurist could conclude that *any* rational trier of fact could have found sufficient evidence to support the conviction." *Id.* (emphasis in original).

Here, a fairminded jurist could conclude that a rational jury could have found enough evidence of petitioner's conviction. During the week leading up to the date of the incident, petitioner threatened the victim, his ex-girlfriend Tina Haugen. *See* RT 4:458 (Haugen's testimony); CT Supp. 2 (voice message stating "I'll break your fuckin' neck . . . .").[1] Haugen

---

[1] All "RT" citations refer to the reporter's transcript. All "CT" citations refer to the clerk's transcript. Both the clerk's transcript and to the reporter's transcript have been lodged with the

8

testified that on the date of the incident, June 27, 2011, petitioner sent her a text message saying, "Vic here your next." RT 4:403, 458, 569, 572. "Vic" apparently referred to Vicky, petitioner's ex-wife, whom he had just beaten.[2] When asked whether this was a threat, petitioner replied that it was a "promise." *See* RT 4:571 ("**Q**. So the defendant told you it wasn't a threat, it was a promise? **A**. Yes."). Petitioner also texted, "No you next tell jefferey hi," and Haugen testified that she understood this text to mean that petitioner was threatening not only Haugen, but also her son, Jefferey. RT 4:570-71.

Angela Lewis, who lived with petitioner, testified that she noticed on the date of the incident that petitioner had spilled gasoline in the back of his truck and that one of her gasoline containers was in the back of the truck. RT 5:621-22, 632-33. She also testified that she saw petitioner in her garage grabbing empty beer bottles from a recycling bin. RT 5:634. And she testified that she heard petitioner say on the phone, "I'm going to blow up your house. I'm coming to blow up your house." RT 5:635-36; *accord* RT 5:679 ("**Q**. You actually saw or heard him saying to Ms. Haugen that he is going to come over and blow up her house? **A**. Uh-huh. **Q**. Is that a yes? **A**. Yes."). Petitioner then told Ricky Caine, "[I]t is on," according to Lewis's testimony. RT 5:679. Petitioner went so far as to say that he was going to Haugen's house. *Id*. ("**A**. Well, he told me he was going to Tina's."). Less than an hour after petitioner left Lewis's house, Haugen's house and Theresa Thatcher's car caught on fire. *See* RT 4:471-73; 5:588-90.

In sum, the government introduced evidence that petitioner threatened Haugen, announced his plan to commit arson, gathered the necessary materials, stated that he would commit arson, and carried out his plan. This was sufficient evidence. Although petitioner focuses on the absence of direct evidence—that no one testified to seeing petitioner throw the Molotov cocktails—a fairminded jurist could find sufficient evidence of petitioner's guilt.

**b. Change of Theory (Claim 1)**

At trial, the government argued that petitioner either committed arson by throwing

---

court.

[2] Haugen testified that petitioner had threatened her by stating that he would beat her like he beat Vicky, his ex-wife. *See* RT 4:463 ("**Q**. And do you remember telling us that the threat was that the defendant said he would beat you like Vicky? **A**. Beat me like the bitch that I am.").

9

Molotov cocktails or aided and abetted the commission of arson by Caine, who was in the car with petitioner when the two men drove past Haugen's house. In this habeas proceeding, petitioner contends that the prosecutor's aiding-and-abetting theory was unfair surprise that violated his right to a fair trial. *See* ECF No. 1 at 21-24. The court cannot grant habeas relief on this claim for two reasons:

First, the government had enough circumstantial evidence to show petitioner's guilt as the perpetrator. Although Rick Caine and petitioner were both in the same car, petitioner does not point to evidence that Caine was the perpetrator, and the circumstantial evidence supported the theory that petitioner threw the Molotov cocktail, as discussed above.

Second, petitioner has not identified a rule of clearly established federal law in support of his claim. Only the holdings in the Supreme Court's decisions can identify "clearly established Federal law," *see Atwood v. Ryan*, 870 F.3d 1033, 1046 (9th Cir. 2017), and petitioner has identified none. Indeed, the Supreme Court has rejected a claim similar to that raised by petitioner, explaining:

> Assuming, *arguendo*, that a defendant is entitled to notice of the possibility of conviction on an aiding-and-abetting theory, the Ninth Circuit's grant of habeas relief may be affirmed only if this Court's cases clearly establish that a defendant, once adequately apprised of such a possibility, can nevertheless be deprived of adequate notice by a prosecutorial decision to focus on another theory of liability at trial. The Ninth Circuit pointed to no case of ours holding as much. . . .
>
> Because our case law does not clearly establish the legal proposition needed to grant respondent habeas relief, the Ninth Circuit was forced to rely heavily on its own decision in *Sheppard*, *supra*. Of course, AEDPA permits habeas relief only if a state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law" as determined by this Court, not by the courts of appeals. 28 U.S.C. § 2254(d)(1). The Ninth Circuit attempted to evade this barrier by holding that Sheppard faithfully applied the principles enunciated by the Supreme Court in *Cole*, *Oliver*, and *Russell*. But Circuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced. *Sheppard* is irrelevant to the question presented by this case: whether our case law clearly establishes that a prosecutor's focus on one theory of liability at trial can render earlier notice of another theory of liability inadequate.

*Lopez v. Smith*, 135 S. Ct. 1, 3-4 (2014) (citations and internal quotation marks omitted). *Lopez* remains good law, and we are bound by it.

### c. Evidentiary Rulings (Claims 3 and 6)

Petitioner challenges several evidentiary rulings from the trial court. He argues that the trial court should not have admitted the evidence that he beat his ex-wife Vicky, that he threatened to break Haugen's neck, and that he pushed Haugen against his truck before the arson. *See* ECF No. 1 at 30-32, 42-53. We will reject these claims for two reasons.

First, petitioner does not identify a rule of clearly established federal law that has been violated here. Again, only a holding in a decision by the Supreme Court can identify a rule of "clearly established Federal law." *See Atwood*, 870 F.3d at 1046. Absent a violation of federal law, this court cannot grant habeas relief on petitioner's challenges to the evidentiary rulings under state law. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018); *Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006).

Second, any error here would be harmless. The standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), governs the harmless-error inquiry here. *See Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014) (per curiam). Under *Brecht,* a petitioner can obtain federal habeas relief only if "the error had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637. To satisfy this standard, the court must have "grave doubt" as to the outcome, meaning that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

Here, the trial court instructed the jury not to rely exclusively on evidence of prior misconduct evidence to find petitioner's guilt:

> If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:
>
> The defendant was the person who committed the offenses alleged in this case; The defendant acted with the intent to injure, intimidate or terrify another person or to willfully damage or destroy someone else's property, as required to be proven in Count 1; or the defendant had a motive to commit the offenses alleged in this case.

11

> In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses.
>
> *Do not consider this evidence for any other purpose. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime.*
>
> If you conclude that the defendant committed the uncharged offense, that conclusion is *only one factor* to consider along with all the other evidence. It *is not sufficient by itself to prove that the defendant is guilty of the charged crimes or any lesser crimes in this case.*

RT 8:939-40 (emphasis added). Petitioner does not explain how this limiting jury instruction was deficient. Additionally, the government introduced other evidence of petitioner's guilt: As discussed above, Haugen testified that petitioner sent her a text message stating it was a "promise" that she would be "next." *See* RT 4:403, 458, 569, 571-72. Lewis testified that she (1) noticed gasoline spilled on the back of petitioner's truck, (2) saw a gasoline container in the truck, (3) saw petitioner gathering beer bottles, and (4) heard petitioner say that he would "blow up" Haugen's house. *See* RT 5:621-22, 632-36, 679. Given these facts, a fairminded jurist could find the alleged errors harmless, if they were errors at all.

### d. Prosecutorial Misconduct (Claim 7)

Petitioner contends that the prosecutor in his case committed misconduct during closing argument by misstating the law. Petitioner argues that the prosecutor misstated the law when he told the jury:

(1) "If you believe that the defendant is guilty, even if you are not sure or wish that you had something more to be sure, absolutely certain, your job is done," RT 8:953;

(2) "You have been convinced by the evidence presented in court that the defendant is guilty . . . you are required to find the defendant guilty," *id*.; and

(3) "[Y]ou can't disregard evidence. You have to view all of the evidence and weigh every piece of evidence. You can't just disregard a piece of evidence because it does not fit into a possible doubt," *id.* at 954.

*See* ECF No. 1 at 54-59. Indeed, the statements were flawed, but the Court of Appeal concluded that they were not prejudicial. *Petrovich*, 2014 WL 2095402, at *8. We agree.

The trial court immediately provided clarifications after the prosecutor's improper statements. After the first statement on the jurors' duty to find guilt, the trial court said:

> Well, all right. What I'm going to do, if you could equate that to the standard of proof, Mr. Welch, just so it is clear.

RT 8:953. In response, the prosecutor then made the second statement that if the jurors are convicted by the evidence presented in court, they must find petitioner's guilt. *See id*. The trial court then said:

> Obviously, the standard of proof is proof beyond a reasonable doubt. Everybody understands that, ladies and gentlemen. That is an instruction. In terms of proving the defendant guilty, the People are required to prove it beyond a reasonable doubt. Everybody understands that.

*Id*. at 953-54. The prosecutor then made the third statement that the jurors must not disregard any evidence, and defense counsel objected. The trial court again clarified the applicable standard by saying:

> All right. Well, I understand what you are saying, Mr. Welch, but I guess technically if the instructions tell them if – for example, if they don't believe someone, they can disregard what they said entirely, so to that extent, I agree with Mr. Terry, but I don't think that is what you are intending to say. I'll sustain the objection in that regard. It wasn't that clear.

*Id*. at 954.

The trial court also gave written, model jury instructions on the standard of proof, CALCRIM No. 220; applicable standards of evidence, CALCRIM No. 222; assessment of witnesses and the jury's right to believe all, part, or none of their testimony, CALCRIM No. 226; and evaluating conflicting evidence, CALCRIM No. 302. CT 1:138-39, 143, 146-47, 153. The court admonished the jury with CALCRIM No. 200: "You must follow the law as I explain it to you, even if you disagree with it. If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." CT 1:138. Petitioner does not argue that these jury instructions were deficient.

13

Given the trial court's clarifications following closing argument, a fairminded jurist could find that petitioner was not prejudiced by the prosecutor's statements during closing argument.

### e. Presentence Conduct Credits (Claim 8)

Under California law, a criminal defendant can earn credit toward his sentence for the time he spent in custody while awaiting trial and sentencing. *See* Cal. Penal Code § 2900.5(a); *People v. Rajanayagam*, 211 Cal. App. 4th 42, 48 (2012). After petitioner had committed his crimes but before his sentencing, an amendment to Section 4019 of the California Penal Code became effective, allowing a pretrial detainee to earn four days of credit for every two days of actual confinement—rather than six days of credit for every four days of actual confinement, as had been the case when petitioner committed his crimes—unless the detainee has not satisfied the applicable rules and regulations of his institution. *See generally People v. Ellis*, 207 Cal. App. 4th 1546, 1549 (2012). This amendment stated on its face that it applied "to prisoners who are confined to a county jail . . . for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." Cal. Penal Code § 4019(h). In this habeas proceeding, petitioner contends that the amendment to Section 4019, which does not benefit him since he committed his crimes prior to October 1, 2011, violates the Equal Protection Clause of the Fourteenth Amendment.

A prisoner's right to equal protection under the law allows him to challenge a state's sentencing regime. *See United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007). When—as here—a prisoner who is not a member of a suspect class challenges a sentencing regime, and where the state has not created an applicable liberty interest in presentencing credit, we apply the rational-basis test. *See Robinson v. Marshall*, 66 F.3d 249, 250 (9th Cir. 1995) (applying rational basis test after noting that state's enactment of sentencing reform did not vest prisoner sentenced before effective date with liberty interest in reduced sentence). Under this standard, a challenged state action must be "rationally related to a legitimate government interest" to be upheld. *Ruiz-Chairez*, 493 F.3d at 1091. The party challenging the state action bears the burden of showing that there is no rational relationship between the differential treatment and the government interest. *See id*.

14

The amendment to Section 4019 withstands rational-basis scrutiny. It is undisputed that California has a legitimate interest in encouraging good behavior among detainees and that this interest is rationally related to the state's ability to offer shorter sentences as incentives. *See Ellis*, 207 Cal. App. 4th at 1551. The issue here is the legislature's decision to apply the amendment only to individuals who committed offenses after the October 1, 2011 effective date. The Court of Appeal considered this cut-off date in *Ellis*, analyzing the issue in detail and holding that the newly-enacted sentencing incentives were rationally based on California's desire to encourage "*future*" good behavior among detainees—meaning good behavior after the date of enactment of the statute. *See id*. (emphasis in original). *See id*. Applying rational-basis review, we agree.

We recognize that tying the date of offense to the statute's effective date might not be the best means to encourage future good behavior among detainees. Petitioner, for example, was in custody as of October 1, 2011. Because he committed his offenses before that date, the amendment gave him no reason to improve his behavior after its enactment. If the amendment applied to detainees *in custody*—rather than those who committed crimes—on or after October 1, 2011, the amendment could encourage future good behavior among a broader class of detainees. Rational-basis review, however, is not so searching. When applying rational-basis review, we do not require that the legislature achieve its goals in the best or most-precise manner possible. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83-4 (2000) ("The rationality commanded by the Equal Protection Clause does not require States to match age distinctions and the legitimate interests they serve with razorlike precision . . . . Where rationality is the test, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.") (citation and internal citation omitted); *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) ("Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'") (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)).

      **f. Ineffective Assistance of Counsel (Claims 4 and 5)**

Petitioner contends that he received ineffective assistance of counsel from his trial and

appellate counsel. A "doubly" deferential standard governs a federal habeas petitioner's claim of ineffective assistance of counsel. *See id*. at 105. On direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis. *See* 466 U.S. 668, 687 (1984). Under *Strickland*, a criminal defendant first must show some deficiency in performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show that his counsel's deficient performance prejudiced him; this requires a "showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id*.

On habeas review, the *Strickland* requirements become even more deferential since they are coupled with Section 2254(d)'s fairminded jurist standard. The question becomes "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added). That is, if there is even *one* reasonable argument that counsel did not violate the *Strickland* standard—even if the state court has not identified the argument—the petitioner cannot obtain habeas relief. *See id*. at 106.

Petitioner contends that he received ineffective assistance from his trial counsel for three reasons: (1) trial counsel failed to object to the admission of petitioner use of the word "cunt" to describe Haugen, RT 4:445; (2) trial counsel failed to object to the admission of Haugen's testimony that "[h]e's threatened my ex-husband that he would destroy him," RT 4:494-95, and that when Haugen was asked if petitioner had threatened her, Haugen replied, "Yes, after he told me what he did to his ex-wife," RT 4:576; and (3) the cumulative effect of trial counsel's errors prejudiced petitioner. Petitioner is mistaken.

First, jurors are presumed to be "intelligent persons," *People v. Martin*, 78 Cal. App. 4th 1107, 1111 (2000), and a fairminded jurist could find that the jurors would not be influenced by the use of profanity. Second, the government had enough evidence to show petitioner's guilt, even setting aside his threats, as discussed above. Third, petitioner's argument that the cumulative effect of his trial counsel's errors caused him prejudice is undeveloped, and this court will not construct arguments on behalf of petitioner. *See Williams v. Rodriguez*, No. 14-cv-2073, 2017 WL 511858, at *9 (E.D. Cal. Feb. 8, 2017) ("Undeveloped arguments that are only argued

in passing or made through bare, unsupported assertions are deemed waived.") (citing *Christian Legal Soc. Chapter of Univ. of California v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010)); *Lexington Ins. Co. v. Silva Trucking, Inc.*, No. 14-cv-p15, 2014 WL 1839076, at *3 (E.D. Cal. May 7, 2014) (collecting cases).

Petitioner contends that he received ineffective assistance from his appellate counsel because his appellate counsel failed to argue that: (1) the prosecutor unlawfully changed the theory of petitioner's guilt at trial; (2) the jury had insufficient evidence to find petitioner's guilt; (3) petitioner had ineffective assistance of trial counsel; (4) the trial court erred in admitting the evidence of petitioner's prior misconduct; and (5) petitioner's rights under the Equal Protection Clause were violated. These arguments are duplicative of the habeas claims discussed above; the court has already addressed these arguments. As discussed above, the alleged first, third, and fourth errors cannot show prejudice, and the alleged second and fifth errors fail on the merits.

### III. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, the court should decline to issue a certificate of appealability.

**IV.     Order**

1. The petition for a writ of habeas corpus, ECF No. 1, is denied.
2. The court declines to issue a certificate of appealability.
3. The clerk of court is directed to enter judgment in favor of respondent and close the case.

IT IS SO ORDERED.

Dated:     March 27, 2019

UNITED STATES MAGISTRATE JUDGE

No. 202